IN THE MATTER OF GEORGE A. DAVIS, An Attorney
at Law.

ORIGINAL.

SUBMITTED JULY 30, 1903.          DECIDED AUGUST 10, 1903.

FREAR, C.J., GALBRAITH AND PERRY, JJ.

It is gross misconduct, meriting disbarment, for an attorney to impede
    and delay a settlement satisfactory to a client solely for the purpose
    of securing an extortionate fee from some one, in a case brought by
    such client for the purpose of protecting an aged, weak-minded rela-
    tive by placing him under guardianship, and to abuse the process of
    the courts in order to compel such weak-minded, aged man, who has
    a dread of litigation, to purchase his peace by paying a large sum of
    money even though it be for the benefit of a client, and to compel
    such aged man by means of threats and intimidations to pay a fee
    substantially larger than he was willing to pay.

OPINION OF THE COURT BY PERRY, J.
(Galbraith, J., dissenting.)

On August 4, 1902, the Oahu Railway & Land Co. filed in
the Circuit Court of the First Circuit at Chambers a bill for
the specific performance of a certain covenant contained in a
lease executed February 7, 1895, by J. K. Sumner to B. F.
Dillingham and Mark P. Robinson and subsequently assigned
by the lessees to the Oahu Railway & Land Co. That lease
was for ninety-nine years and the covenant just mentioned
was that Sumner would at any time within the term of the
lease at the option and request of the lessees or their assigns sell
and convey to them for the sum of $100,000 all of the demised
premises, being certain property fronting on Honolulu Harbor,

excepting only a reservation by the lessor for a term of 25 years,. from the date of the lease, of a certain portion 50,000 square feet in area.    Those named as parties respondent in that bill were J. K. Sumner and the Right Rev. Gulstan F. Ropert, Bishop of Panopolis, the trustee named in a deed of trust executed September 17, 1898, by J. K. Sumner conveying all of the grantor's property in the Hawaiian Islands subject to certain trusts therein named.   This is the deed of trust which was the leading subject of discussion in Ropert v. Sumner, *ante* p. 76, which sec.   In the suit for specific performance service of summons was made on the Bishop on August 5, 1902, and on Sumner on the 22nd of the same month.

On September 4, 1902, no judicial proceedings having in the meantime been had in the suit for specific performance other than to grant to the respondents extensions of time to plead, answer or demur, Maria S. Davis, the sister of Sumner, filed in the Circuit Court of the First Circuit a petition for the appointment of a guardian of the person and property of Sumner, alleging in the petition, *inter alia,* that Sumner "is of unsound mind and has been for several years past and has been and is unable to transact any business or in any way care for and control his property," and "is an insane person within the meaning of the statute" and "is utterly incapable of and unable to care for and manage" his property.   Later in the same day, to wit, at midnight, a bill in equity was filed, entitled "John K. Sumner, by his next friend Maria S. Davis, Plaintiff, v. Oahu Railway & Land Co., a Corporation, and the Right Reverend Gulstan F. Ropert, Bishop of Panopolis, Defendants," in which it was prayed that the Oahu Railway & Land Co. be restrained from purchasing and the Bishop from conveying any of the property of Sumner and that the lease of February 7, 1895, and the trust deed of September 17, 1898, be set aside and declared null and void.   The substantial averments of the bill upon which the prayer for relief was based were that Sumner "is insane and was insane" at the time of the execution

of the lease and trust deed and that the lessees well knew at the time that Sumner was of unsound mind, that for these reasons the two instruments were absolutely null and void, that the respondents had agreed to settle the suit for specific performance and were about to convey to the Oahu Railroad Company the land sued for, that Sumner "is also incapable of entering into any contract and is at present of unsound mind" and that the officers of the Railroad Company "well know that the said J. K. Sumner is insane," and that unless the respondents were restrained by injunction the conveyance would be made.

Upon the filing of the bill Maria S. Davis was appointed next friend of Sumner and authorized to prosecute the suit and a temporary injunction was issued as prayed for. On September 19, 1902, Sumner intervened and moved to dismiss the bill on the ground that he was sane and entirely competent to care for his property and on September 24 after a hearing as to Sumner's sanity based solely on affidavits the motion was granted and the bill dismissed. The complainant filed a notice of appeal.

In the guardian case Sumner filed an answer on September 6 denying the allegations as to unsoundness of mind and an answer to the same effect on September 19. The case thereafter went to trial, testimony as well as written evidence being adduced, but before the trial was concluded a consent decree dismissing the petition and declaring Sumner *compos mentis* was, on October 13, 1902, at the request of the attorneys, or one of them, of Maria S. Davis and those of Sumner, signed. On the same day a deed conveying to the Oahu Railway & Land Co. for the sum of $110,000 all of the land sued for and also the reserved portion free from the lease was executed by Sumner and the Bishop and joined in by Maria S. Davis, her son R. W. Davis, John S. Ellis, William S. Ellis and Victoria Buffandeau, *nee* Ellis, and the spouses of the three Ellises and the appeal in the injunction suit was withdrawn. The suit for specific performance was likewise discontinued on the following day.

The termination of these various proceedings and the execution of the deed were by virtue of a settlement reached by all of the parties concerned, the terms of which were, in part, that the Oahu Railway & Land Co. should pay to Sumner for the property conveyed $110,000 and that Sumner should pay to each of the three Ellises $10,000, to the Catholic Church $10,000 and to Maria Davis $10,000. The respondent was also to receive a fee of $5,000 for his services and those of his associates in the guardianship and injunction cases, Magoon & Peters, and other attorneys were likewise to receive certain amounts as fees. Further than this the terms of the settlement and by whom and by what methods it was negotiated or reached are matters which will be treated of hereafter in so far as it may necessary to do so.

On October 27, 1902, Bishop Ropert filed a bill in equity praying for the appointment of a new trustee in his place under the deed of trust of September 17, 1898, and alleging that the sum of $48,000, being the balance of the proceeds of the sale to the Oahu Railway & Land Co. remaining after the payments made according to the terms of the settlement, had been by him paid over to Sumner under the impression that it was Sumner's property and by Sumner deposited in Bishop & Company's bank. That proceeding resolved itself finally into a contest between Sumner on the one side and the Ellises on the other as to whether the fund was the property of Sumner free from any trust or was still subject to the trusts declared in the deed of September 17, 1898. From its institution the firm of Magoon & Peters represented Sumner but commencing with the first day of December, 1902, or some day shortly thereafter, and until its termination in favor of Sumner on September 26, 1903, the respondent also appeared for Sumner.

The matter now before us is an information by the Attorney General charging the respondent, a duly licensed attorney of this court, with professional improprieties and malpractice in the proceedings briefly outlined above.

The first charge is that the respondent on or about September 2, 1902, procured himself to be retained as attorney for Maria S. Davis and instigated and advised her to institute the guardianship proceedings; that on or about October 12, 1902, Sumner and Maria S. Davis agreed to compromise and discontinue that case on the payment by Sumner to Maria S. Davis of the sum of $10,000 and that Maria S. Davis notified the respondent of her intention to so settle and discontinue the case; and that the respondent, though claiming to act as her attorney, refused to settle and discontinue the case unless he was paid the sum of $5,000 and threatened to prevent such settlement and discontinuance or to take any steps to so settle and discontinue unless and until arrangements were made whereby he, the respondent, should receive the sum of $5,000 as counsel fees.

In the information it is alleged that Sumner was a man of upwards of eighty-four years of age, with little or no knowledge of business or the value of money, and by reason of his great age and lack of knowledge, was easily influenced and controlled, and that all of these facts were well known to the respondent.

The second charge is that on or about December 1, 1902, the respondent falsely represented to Sumner an dto one R. W. Davis that he, the respondent, could immediately obtain for Sumner the sum of $48,025 at that time deposited in Bishop & Co.'s bank, if Sumner would pay him $3,000 for his services in obtaining the money and that respondent knew such representations to be false, that by means of such false representations he persuaded and induced Sumner to give him a promissory note for $3,000 payable on demand and reciting that it was for value received, that no value had then been given for the note, and that Sumner, misled by the respondent's misrepresentations, believed that the note was necessary to insure the obtaining immediately of the $48,025 and that upon respondent's failure to obtain the money the note would have no value

or effect; and that the respondent, although he failed to obtain
the money, kept the note and refused to return it.

Third charge: that the respondent procured himself to be
appointed as one of the attorneys for Sumner in the case of
*Ropert v. Sumner* and acted as such; that on June 25, 1903,
that case was finally decided by the court and that the decree
was that the $48,025 be paid to Sumner; that on or about June
26, 1903, the respondent, well knowing Sumner's weakness and
inability to understand financial matters, threatened Sumner
that unless the latter should pay him a fee of $2,500 for his
services in *Ropert v. Sumner,* he would sue Sumner on the
$3,000 note and would garnishee the $48,025 and further tie
up that money; and that by means of such threats and inti-
midations and preying upon the fears of Sumner, who, as
respondent knew, had great dread of litigation, the respondent
extorted from Sumner the sum of $2,000.

1.    The allegation that the respondent procured himself to
be retained by Maria S. Davis as her attorney in the guardian-
ship case, is not sustained by the evidence. On the contrary,
the testimony of R. W. Davis, the only witness produced and
examined by the Attorney General on the subject, is that, at
the request of his mother, Maria S. Davis, he sought the res-
pondent and engaged him.

As to the remainder of the first charge we find the following
as facts: A day or two prior to September 4, 1902, Maria S.
Davis, the sister of J. K. Sumner, having learned of the in-
stitution of the suit for specific performance and that the
Ellises had engaged counsel and were to receive some large
sum, either $50,000 in all or $25,000 apiece from Sumner out
of the proceeds of the land, sent for and employed the respond-
ent to protect her brother and incidentally to represent her.
On the 4th of September, at the respondent's request, Mrs.
Davis and her son went to the office of the respondent and there
the latter, who had already prepared the petition in the guard-

ianship suit, explained that the suit was one to have Sumner declared *non compos mentis*. Mrs. Davis asked what those words meant and her son replied that they meant insane or crazy. Mrs. Davis did not like the idea and objected, but upon the respondent advising her that that was the only way to bring the suit yielded and consented to its institution. About the midnight following, the petition in the injunction suit, signed and sworn to by the respondent himself, as was the first petition, was filed, but whether with or without Mrs. Davis' express consent or knowledge does not appear. It may be assumed for the purpose of this case that it was with her knowledge and express consent. After the injunction suit had been resisted on affidavits and dismissed and after the guardianship suit had been on trial for several days and Sumner himself had been on the stand one whole day and parts of two other days, Sumner, who is a man 84 years of age and who has been involved in much distressing litigation (see decision *In re A. S. Humphreys and F. E. Thompson* filed this day) during the period of eight years last past and has a great dread of litigation, worried and wearied beyond endurance, called on his sister then living on Sumner Island, and told her of his aversion to court proceedings and that he wished to be freed of all the pending litigation and make the sale to the Oahu Railway & Land Co. and return to Tahiti, and said that he wished to give her, to each of the Ellises and to the Catholic Church $10,000 each, and asked her if she would discontinue the proceedings. His sister replied that she was willing to do so, that that case, like all other proceedings she had ever brought against him had been brought merely to protect him and not as demands for money, but that if he wished to give her money, it was his to give and he could do as he pleased about that. She agreed to the settlement. R. W. Davis then went to the respondent and informed him of what had occurred. The respondent refused to agree to the settlement unless there was some definite arrangement about his fee and

said he wanted $5,000. R. W. Davis said that would leave his mother only $5,000, and, finally, that he would go and see his mother about it. Mrs. Davis refused to agree to pay the amount demanded and R. W. Davis so reported to the respondent, whereupon the latter said he would see about it. While R. W. Davis was at respondent's office on this occasion, Mr. F. E. Thompson, representing Sumner, entered and talked to the respondent about the settlement. The respondent said: "That's all right about the settlement, the settlement is all right. What about my fee? I want to know something about my fee." Thompson said that Sumner refused to pay anything toward the fee. Respondent said, "I won't allow the settlement to go on unless there is something definite about my fee." After Thompson left, respondent said to R. W. Davis that he was going to see Mr. Dillingham of the Oahu Railway & Land Co., left the room apparently for that purpose, had an interview with Mr. Dillingham, and shortly afterwards returned and said that the Railway officers would have a meeting that night to consider the question of his fee and that the answer would come in the morning. The next morning respondent told R. W. Davis that the Oahu Railway & Land Co. had agreed to pay $5,000 extra to cover his fees, making a total price of $110,000 for the land. From that time on there was no further impediment to the negotiations for settlement, so far as the respondent was concerned, and the settlement was very soon consummated in the manner above stated. Mrs. Davis received $10,000 and the respondent $5,000 out of which he subsequently paid his associates, Messrs. Magoon & Peters, $2,500. In brief, the respondent attempted by impeding and delaying the proposed settlement to secure for himself either from Maria S. Davis or from Sumner or from the Railroad Co. a fee of $5,000.

We have found these facts against the denial of the respondent that he ever refused to agree to the settlement or to discontinue the proceedings. His version of the matter is in brief as follows: that at the first interview with Mrs. Davis at which she employed him as her counsel he was informed

that the Ellises were about to receive $50,000 and the Catholic Church $25,000 from Sumner and that Sumner himself was to take the balance of $25,000 to Tahiti; that in great haste and by dint of much work he at once prepared the guardianship and injunction suits and instituted them for the purpose of preventing the distribution just mentioned and in order to secure from Sumner for Mrs. Davis some of the money. "In other words, I was not going to allow the horse and carriage to go out of the barn before locking the door and run away and smash the whole business, for I knew that the minute that they got the $100,000 and divided it up would be the last. I didn't wait but I worked all night. * * * * If the property had been sold and the money had been divided, Maria S. Davis, his own sister, would not have got a cent. That is the reason I instituted those proceedings in equity and the reason I filed the guardianship suit." * * * "Q. Then you were not protecting the interests of Maria S. Davis but of John K. Sumner in this suit? A. Well, I don't know what you call it, because if that land had been sold and the money divided as I detailed already yesterday in my evidence, the money would have been divided between the Ellises and the Roman Catholic Church and Maria S. Davis would not have gotten a dollar and she was an heir of Sumner." In his closing address to the court the respondent reiterated and insisted, as though his action were something laudable, that he had brought the two suits in order to obtain money from Sumner for Maria S. Davis and that he succeeded in getting $10,000 for her. Proceeding further with the respondent's version, his testimony is to the effect that Mr. Dillingham asked him if the matter could not be settled, and thereupon he, the respondent, asked and obtained authority from his clients to negotiate for a settlement. "I said" to Mrs. Davis and R. W. Davis, " 'You are afraid that Sumner will dispose of all his property before he dies, will divide it up and that you won't get any; now, if the old man is going to give you what is fair and right, are you willing to do it?' She said 'Yes.' " He goes on to say that he did nego-

tiate and finally succeeded in obtaining $10,000 for his client and $5,000 as a fee for himself. Just what the negotiations for that $10,000 consisted of he does not say, but he does testify very clearly as to the negotiations for the $5,000, to the effect that he went to Mr. Dillingham,—this, upon all the evidence, was at a time when in all other respects the terms of the settlement had been agreed upon by all the parties and when the Railroad Company was willing to pay and Sumner was willing to receive and accept the sum of $105,000 in full for a conveyance of all the property finally conveyed, and when all, other than the respondent and possibly, though we do not so find definitely, his associates, were willing to close the matter on that basis—and said to him, "The proper way for you to get a title to this land and the proper way to settle this suit is to get all the living heirs of Sumner to join in a deed to the Oahu Railway. 'Now,' I said, 'You can afford to give a few thousand dollars more so that Maria S. Davis can have the things fixed up. I have gone to all this work, I have instituted these proceedings of guardianship,' I had gone on with an immense amount of labor in connection with it, I had filed this, appealed this equity case to the Supreme Court, and I said, 'I have hired Magoon & Peters and they have got to get paid, and I think I have earned, Mr. Dillingham, $2,500 and I think Mr. Magoon has earned $2,500, so that if you will add $5,000 on to what you have already agreed to settle for, I will advise my clients to settle,' and he said he would." In other words, if the respondent's testimony is to be believed, we are compelled to find, first, that the respondent, whether the idea was first suggested by his client or originated in his own mind, brought the two suits, not for the purpose of proving the allegations that Sumner was of unsound mind and incapable of caring for his property or of obtaining a decree to that effect and having a guardian appointed for him or his property or of preventing the threatened execution of an invalid deed and the impending dissipation or loss of his property, these being the legitimate and expressed objects of the proceedings, but for the ulterior

purpose of extorting money from Sumner; second, that after wearying Sumner by the litigation into a condition of mind where he was willing to buy his peace for a substantial sum of money he entered into negotiations with him and brought about a settlement on the basis of Sumner's paying his sister $10,000; and, third, that, keeping his object consistently in view and well knowing the anxiety of the Oahu Railway & Land Co. to acquire the land, he then gave that company to understand, in mild and polite words though it may have been, that in order to secure a conveyance to the land which the owner himself was willing to give for $105,000 the company would have to pay $5,000 more to cover the amount of the respondent's fee and practically blackmailed the company into paying that amount. If the story of the respondent is true, and we believe that it is in so far as it relates to his own purpose, as distinguished from that of his client, in bringing the suits, to his consistently keeping that object in view, to his success in producing the necessary condition of mind on the part of Sumner, and to his blackmailing the Railroad company to the extent of $5,000, then he has been guilty of gross misconduct, more flagrant and serious even than that proved against him by the other evidence in the case.

The position in which the respondent has placed himself by his own admissions renders it unnecessary, perhaps, to set forth any of the reasons for our accepting as true and relying upon the testimony of R. W. Davis as a whole and more particularly at points where it is in conflict with that of the respondent; and yet, in view of the nature of the case and the serious consequences to the respondent of a finding of guilty, we shall refer, to some extent, to the subject. In the first place, that witness while on the stand impressed us as being truthful. His appearance, attitude and manner of testifying all conduced to that impression. He seemed to be careful not to overstate matters against the respondent and testified without hesitation and without reserve to facts in the respondent's favor, as, for example, in disproving the charge that respondent had pro-

cured himself to be employed as counsel for Maria S. Davis.
He exhibited no feeling of hostility against the respondent. No
adequate motive for his perjuring himself or deliberately mak-
ing up a case against the respondent appears or has been sug-
gested. Many opportunities presented themselves for his es-
tablishing an even stronger case against the respondent if he
had felt inclined to do so. The present proceedings were not
in any manner instigated or even suggested by him or his
mother or Sumner, but were instituted, as we well know, solely
because of and in compliance with the direction of this court
to the Attorney General. (Parenthetically, we may say that
that official does not deserve any of the abuse so freely heaped
upon him by the respondent at the hearing and in his closing
address. Mr. Andrews did not move against the respondent
until he was directed by the court to act.) Such corroborating
evidence as there is at disputed points corroborates R. W. Davis
and not the respondent, as, for example: the respondent testi-
fied that Mr. S. M. Damon in refusing at the bank to pay the
check for $28,025 hereafter referred to gave as a reason that
the check did not bear J. A. Magoon's O. K. This was material
in view of respondent's claim that he had not known such O. K.
was necessary and that he did not sue the bank for the money
because Magoon refused to O. K. Mr. Damon and R. W. Davis
both testified that that was not stated as a reason by Mr. Damon.
Likewise, the respondent denied having sought employment by
Sumner in the case of *Ropert v. Sumner,* R. W. Davis said
he did, and J. A. Magoon, whose credibility will be referred to
later, testified,—and he was not cross-examined or contradicted
on the point—that some time prior to the respondent's entering
the case he, the respondent, had suggested to him, Magoon, that
he be retained and asked him to speak to R. W. Davis about it.
Moreover, on the precise question as to whether, as the res-
pondent claims, Mrs. Davis and R. W. Davis authorized him
to institute and conduct negotiations for a settlement which
led up to and resulted in the $10,000 payment, or whether, as
R. W. Davis testified, the offer came from Sumner to his sister

and was by her acquiesced in and then reported to the respondent, the probabilities greatly preponderate in favor of R. W. Davis' story. Mrs. Davis is 77 years old and at best her remaining years are not many. She has on several occasions brought similar proceedings for the protection of her brother and never for profit. Until the case under consideration she never received or asked for money for purposes of settlement. It is not at all likely that now so late in life her character has changed for the worse. Sumner on the day of the settlement left the Ellises with whom he had been living and took up his residence with his sister. They were on the very best of terms. Is it at all likely that this would have been so if the offer to settle for cash had come from his sister,—if, in other words, he had been openly made by her to pay for his peace? In view of the immediately succeeding friendly relations, is not the statement that Sumner first went to Maria and offered to give her as well as each of the Ellises and the church $10,000 by far the more probable and natural? We think it is. That Sumner's willingness to make the offer may have resulted or did result from his worried condition of mind caused by the suits advised by the respondent does not in any degree militate against this view.

We deem it an aggravating circumstance, whether with reference to the finding based on the testimony of R. W. Davis or with reference to one based on the respondent's own version, that the amount of the fee demanded and obtained was grossly excessive, and this, too, even assuming, what is not the fact, that the respondent brought and conducted the two suits in good faith and for legitimate purposes. The issue upon which the injunction suit was disposed of was raised by a motion by Sumner to intervene and dismiss the bill and was simply whether Sumner was sane or insane within the meaning of the statute. No oral evidence was taken; the issue was decided upon affidavits, one only being filed on behalf of the complainant. The hearing upon the motion occupied but one day, the decision being rendered two days later and the decree filed on the next

day. In the guardianship case there was a simple petition alleging unsoundness of mind and an answer by Sumner denying the truth of that allegation. Upon that issue a trial was commenced before Circuit Judge Robinson on September 29, 1902, continuing until the next day at noon at which time the case was transferred to Circuit Judge De Bolt. The trial before Judge De Bolt occupied the first, second, third and eighth days of October, on six other days counsel appeared in court and continuances were ordered and on the 14th of October the consent decree was filed. It is unnecessary to say definitely what fees the respondent and his associate firm would have been justified in charging for these proceedings in court and for all other necessary work done in connection with the suits and their settlement. It is clear beyond any doubt that the charge of $2,500 for each of the attorneys is grossly excessive.

2. We find upon the evidence that the respondent did seek to be employed as an attorney for Sumner in the case of *Ropert v. Sumner.* Respondent denies this, but we believe the evidence of J. A. Magoon and R. W. Davis on this point to be true. That evidence shows that at some time prior to December 1, 1902, the respondent suggested to Mr. Magoon, who was then Sumner's attorney, that he, respondent, be retained in the case and asked him to speak to R. W. Davis and did so but no employment resulted from that attempt. Later, on or about November 30th, the respondent approached R. W. Davis on the street and said to him that the bank had no right to hold that money, that the case was not being properly conducted, that he could get the money out in twenty-four hours and that if it was not out in that time he would sue the bank. R. W. Davis reported the conversation to Sumner with the result that the latter invited respondent to come out to his house to see him about the matter. The respondent did so, on the first of December, a notary also attending at the respondent's suggestion. The respondent had with him already prepared and at that interview procured the execution of a note reading, omitting the date and signature, "On demand for value received

I promise to pay Geo. A. Davis or order the sum of three thousand dollars at the Banking House of Bishop & Co., Honolulu, without interest," and also a power of attorney authorizing the respondent to act as counsel for Sumner "in all suits and actions in equity and at law now pending in the courts of the Territory of Hawaii and especially in the suit in equity now pending between the Bishop of Panopolis, plaintiff, and John K. Sumner, defendant, the plaintiff praying to be discharged as trustee" and to take all steps "necessary to obtain possession of the sum of $48,025 now on deposit in Bishop's Bank" and appointing him Sumner's "attorney in fact as well as of record to represent me in all litigation and to collect and receipt for all monies due or to become due me in this Territory and to bring actions at law or suits in equity to obtain judgments and decrees for the purpose of establishing my rights" and containing an agreement by Sumner to pay him $3,000 "for his services at any time when he may demand the same." The respondent testified, and so also did the notary, that the power of attorney was read and carefully explained to Sumner and R. W. Davis and that R. W. Davis translated it into Hawaiian for Sumner's benefit, and the respondent claims, in his testimony and in argument, that the power of attorney was intended by him to be what it purports on its face to be, namely, a grant of authority for the respondent to appear as Sumner's attorney throughout the Ropert case and that it was not intended solely as authority for the immediate collection of the $48,025 from the bank and that likewise the note was intended to secure the payment of fees for services to be rendered in the whole litigation and not only in case of immediate recovery of the money. Let it be assumed for the purposes of this case, without so deciding, that, so far as the intention and understanding of the respondent at that time are concerned, these are the facts and that he did not procure either of those instruments by fraud. Sumner and R. W. Davis testified that the understanding and agreement at that time were that the power of attorney and the note were to apply to the immediate collection, that

Sumner did not intend by virtue of what was said and done that night to employ respondent as his attorney in the Ropert case (Sumner does not in any way deny that the respondent subsequently *acted* as his attorney in the Ropert case and in a characteristic way paid him at the close of the case on the supposition that perhaps Magoon or R. W. Davis had called him in) and that the note was to be of no force if the money was not at once collected from the bank. Indulgence in the above assumption does not require us to hold that the testimony of Sumner and R. W. Davis was therefore false and while the respondent, as assumed, may have had the understanding above mentioned and may have been guilty of no fraud in procuring the execution of the note or of the power of attorney in form as signed, yet it may also be, and we believe that this was the fact, that R. W. Davis understood the matter as testified to by him and that Sumner also so understood it or else had no clear understanding on the subject at all. Neither in this nor in any other branch of the case do we rely to any great extent on Sumner's testimony—this owing to his weakness of mind and memory; but aside from this there is ample evidence to show that the circumstances were such that R. W. Davis' and Sumner's understanding may well have been as claimed by them. The power of attorney is in the respondent's handwriting and R. W. Davis testified that he was unable to read it very well. That is not difficult to understand. The Hawaiian translation under such circumstances could not have been of much value. The notary, after testifying to the careful reading and explanation of the power of attorney, yet said that the impression that the respondent left upon his mind by what he said that night was that he would get the $48,025 out of the bank very shortly,—"that if he didn't get it the next day he would know the reason why." The respondent had told R. W. Davis and through him Sumner that the money should have been out long ago and that the pending suit was not being conducted in the right way. That could well have been understood to mean that the respondent was to apply some new

method of relief. The respondent himself testified that he told Sumner that the note was not to be paid until the case should be completed, that he would not charge as much as $3,000 unless the services rendered should merit compensation to that amount and that 'You have got to trust me, I am your lawyer and I will do what is right with you at the close of the case." In the light of these circumstances is it to be wondered at that Sumner and R. W. Davis believed that the written instruments were largely matter of form and that they were not all that they purported on their face to be but meant something different? It may be added that Sumner's and R. W. Davis' failure to demand a return of the note is explained by the fact that the respondent said to R. W. Davis immediately after the attempt to collect the check that he would keep the note because he was going to sue the bank.

3. The decision of this court in the Ropert case, declaring the $48,025 to be the property of Sumner free from any trust, was rendered June 25, 1903. Sumner and R. W. Davis at the time were in Koolau but were promptly notified of the result and asked by Sumner's attorneys to come at once to Honolulu. In pursuance of that request they went to the house of J. A. Magoon, arriving at about 8:30 o'clock p. m. and there finding respondent and Magoon. Respondent introduced the subject of his fee.. He said that he wanted his fee adjusted and settled, that the note was for $3,000 but that he would ask only $2,500. Sumner said that that was too much and that $1,500 would be ample and offered that amount. Respondent said he had worked very hard all through the case, that he ought to have $2,500 and that he would not take less. Respondent insisted upon the amount named and Sumner stubbornly declined to pay it. As Mr. Magoon said on the stand, "there was a good deal of talk there that evening. I think Mr. Sumner stayed about half and perhaps three quarters of an hour or may be longer, I don't know, I know it was a long time, and Mr. Davis and Mr. Sumner were talking about the thing backwards and forwards, Mr. Davis urging it and Mr. Sumner declining to

pay it and said that he would not pay more than $1,500."
"Davis got mad," R. W. Davis testified, and his testimony in
this respect remains uncontradicted. The respondent said to
Sumner that he had an attorney's lien for his fee, that the
money could not be obtained from the court unless his fee was
first paid, and that he would prevent its being paid out of the
court unless Sumner should agree to pay $2,500. Sumner
held out however and finally left. The following morning
Sumner and R. W. Davis met the respondent at Magoon's
office. The fee was again talked of. The respondent continued
to demand $2,500 and Sumner still held out for $1,500. The
respondent, holding a paper in his hand and "shaking it," said
that he would garnishee the money. "I will stop the money,
I will garnishee, that money shall never be paid until I get my
fee. I will tie that money up in the bank." Sumner and R. W.
Davis then spoke to each other for a few moments in Hawaiian
and finally Sumner offered to pay $2,000. This the respondent
at once accepted and the parties thereupon appeared before the
Circuit Judge and there a check for $2,000 in respondent's
favor was signed by Sumner and the fund in the custody of the
court was paid over to him.

We are satisfied from the evidence that Sumner's final con-
sent to pay $2,000 was due solely to the respondent's manner
and undue insistence and to his threats to "tie up" the money
and was reluctantly given in order to avoid the delays and the
annoyance of further litigation. That the respondent at that
time well knew that the man he was dealing with was weak-mind-
ed and easily influenced, is indisputable. In his answer in this
case he specifically admits the truth of the allegation in the
information "that the said J. K. Sumner was a man of up-
wards of the age of 84 years with little or no knowledge of
business, or the value of money, and by reason of his great
age and lack of knowledge was easily influenced and controlled,
all of which facts were well known to said Geo. A. Davis." In
the decision then just filed, this court, unanimous on that point,

had held that Sumner was weak-minded and easily influenced. The petition for guardianship, the main allegations of which have been already recited above, was sworn to by the respondent himself, and not on information and belief; and in the injunction suit, in support of an application for the appointment of Maria S. Davis as next friend of Sumner, the respondent swore "that he has a personal knowledge of the facts herein deposed to and that the facts and statements herein contained are just and true," and one of the allegations thus deposed to was that Sumner "is a person of unsound mind and has been insane for a long period of time." The respondent well knew, too, of Sumner's dread of litigation.

The respondent contends that the fee of $2,000 was intended to cover future as well as past services. We believe this to be entirely an after-thought and that at the time the amount of the fee was adjusted and paid it was neither the intention nor the understanding of the parties that all or any services to be thereafter rendered by the respondent were being included or paid in that fee. If future services, what future services? In all cases then pending in the courts, or in all cases pending or to be instituted relating to Sumner's sanity, or in all cases relating to the $48,025, or in all cases of whatsoever nature and whensoever brought? There is nothing in the evidence to show any understanding between Sumner and respondent on these points. It is true that *after* the respondent had been paid the $2,000, Mr. Magoon asked him, "Does not this include—you will help me out in the guardianship proceedings that are now before the court, will you not, Mr. Davis?" and respondent answered, "Oh, yes, I will, call on me when you want me," but from the respondent's own evidence this appears to have been due, not to any contract obligation, but to a feeling on the respondent's part that he had already gotten enough out of Sumner. "$2,000 is a great deal of money," he testified. "Indirectly, I have got $4,500 out of the Sumner business, and I don't consider that I ought to take any more. Directly and in-

directly, it arose out of it. I do feel that I ought to help. I got $2,500 from Maria S. Davis, I got $2,000 from the old man, that is $4,500, but I think I ought to assist him to get out of trouble as far as I can." But it is not what respondent now thinks or has thought *after* the $2,000 was paid that is to be considered in this connection, but what the understanding between the parties was in paying and receiving the fee. It is clear from the evidence that all that was mentioned or considered while the amount of the fee was being discussed was *past* services. "I *have worked* hard," the respondent said,—not, 'I have also much work yet to do." "Can't we make a settlement?" the respondent asked. "I want to get my money and I want to wash my hands, Mr. Sumner, of your transactions;" and before Judge De Bolt, after the check was signed, "Sumner, here is your note for $3,000, you have paid me, *we are quits,* that is satisfactory." As if more were needed, an entry dated June 26, 1903, made by respondent by way of receipt in Sumner's cash book, reads, "To cash paid me this day in full [(Sgd.) Davis] $2,000." That is not a receipt for future services.

The past services were the futile attempt to collect the check on the bank and the preparation of a declaration for an action, which was not filed, against the bank, those rendered in the Ropert case, in the W. S. Ellis petition for guardianship and perhaps in one or more matters of minor importance, not specified. The services in the Ellis guardianship case consisted simply in resisting a motion for a restraining order. The trial in the Ropert case began on December 17, 1902, and was continued on December 26, 27, 30 and 31, and January 2, 3, 5, 6, 8 and 9 and other proceedings in it were had on December 18, 22 and 29 and January 2 and 3, and 14. The appeal was argued in this court on March 2 and 3, and June 16, and a motion to advance was presented on another day. The pleadings, briefs and other papers filed in the case make up quite a voluminous record, with all of which we are quite familiar. In our opinion the fee of $2,000 was excessive—it is unneces-

sary to say to what extent. And the fee demanded, $2,500, was still more excessive. We regard this merely as matter of aggravation in connection with this charge, the gist of which is the respondent's method in obtaining the fee rather than the amount of the fee.

Still the evidence requires the finding on this charge, and we make it, that the respondent, by means of threats and intimidation and taking advantage of the mental infirmities of Sumner, caused the latter to pay him a fee substantially larger than Sumner was willing to pay. An announcement of an intention to sue to recover the fee or to garnishee the bank or other trustee or debtor to the extent of the amount claimed, might, if it had stood alone, have been proper and excusable but the respondent went much further.

A very brief reference to the credibility of the witness J. A. Magoon in this case is perhaps not out of place as some of the findings made are based, in part at least, upon his testimony. The witness impressed us while testifying as being truthful. He was not hostile to the respondent; on the contrary he seemed somewhat reluctant to give testimony which might tend to prove the charges. His interest, so far as there was any, would seem to have been against testifying any further than was absolutely necessary. He was not cross-examined or his evidence contradicted in any material respect by the respondent.

That in cases of this nature the court should act with unusual caution both in weighing the evidence and in determining the penalty or order, is fully appreciated. See *In re A. S. Humphreys and F. E. Thompson, ante* p. 155. The law undoubtedly is that an attorney should not be suspended or disbarred unless the court is clearly satisfied of his guilt. Our findings in this case are made with that rule in mind.

Acts such as the respondent has been found guilty of, on his own admissions and otherwise, cannot be tolerated. They are inconsistent with the principles of justice and honor and

fair dealing. To impede and delay a settlement satisfactory to a client solely for the purpose of securing an extortionate fee from some one, to abuse the process of the courts in order to compel a weak-minded and easily influenced aged man who has a dread of litigation to purchase his peace by paying a large sum of money even though it be for the benefit of a client, and to compel such aged man, by means of threats and intimidation to pay a fee substantially larger than he was willing to pay, constitutes misconduct so gross as to show the attorney to be unworthy of his office and as to merit and require disbarment. We can no longer certify to the public that the respondent is worthy of confidence and patronage in the line of his profession or that he may be safely entrusted with its powers. If the fact be that the respondent regards his conduct and methods and purposes in connection with the two suits as outlined by him to be honorable and proper, then we can only say that we cannot share in or countenance such standards and that we decline to be responsible in any degree for his acts.

The order of the court is that the respondent be and he hereby is disbarred and that his name be stricken from the roll of attorneys and counselors of the courts of this Territory.

*Attorney General Andrews* and *W. S. Fleming* in support of the information.

*Respondent* in person.

### DISSENTING OPINION OF GALBRAITH, J.

I am inclined to concur in one finding made by the court, namely, that the respondent, under his own evidence, is guilty of a misuse of the process of the court in bringing the injunction and guardianship proceedings. Still it is apparent that the wrong done thereby is more theoretical than real; that Sumner was annoyed and worried by the suits is clear, but as a result of the suits he made a generous allowance to his aged and helpless sister. This ought to count for something.

It should be remembered in behalf of the respondent that suits to put John K. Sumner under guardianship have been brought so often in the courts of this country that the respondent may have honestly believed that it was legitimate and proper to commence the suits although they were not pressed to a logical conclusion.

I do not think that the evidence justifies the court in differentiating between the motive of the respondent and his client in the commencement of the proceedings, since every step taken therein seems to have been consented to and approved by the client. Nor does the testimony support the finding that the respondent was guilty of blackmailing the railroad company by compelling it to pay his fee, although that fee was excessive. The additional $5,000 was paid by the company voluntarily and was added to and recited in the deed as a part of the consideration for the land. There is much to support the conviction that with this fee added to the agreed consideration the company did not pay the actual value of the land conveyed. The respondent was regularly employed in those cases and was entitled to pay for his services. It seems that his client was not willing to pay his fee from the sum obtained for her but was willing that the railroad company should pay the amount asked as a fee and that the company voluntarily paid it. These facts fall short of establishing a case of blackmail.

Again the evidence to my mind does not sustain the finding that the respondent "by means of threats and intimidations and taking advantage of the mental infirmities of Sumner, caused the latter to pay him an excessive fee." The fee of $2,000 paid the respondent was possibly excessive but it is not probable that Sumner was intimidated by threats to pay it. The respondent did not take Sumner alone into the privacy of his back office to talk to him about the fee. All of the conversations with Sumner about the fee were in the presence of Sumner's "leading counsel" and his friend, R. W. Davis, and when the amount was agreed on the respondent insisted that it be paid in the presence of the Circuit Judge. This latter fact alone demon-

strates the honesty of his intention. This charge should fall by reason of its sheer improbability and for want of support by credible testimony.

I can overlook some irregularities in the respondent on account of his well known idiosyncrasies and his frank and open method of doing business. I fear that the court has not made due allowance for these in its opinion. The respondent does battle in the open and not from ambush. This is something in his favor.

The reputation of the respondent for honesty and integrity in the community was testified to by some of the leading members of the bar, one of whom (Hon. F. M. Hatch) was and is the senior counsel of the Oahu Railway and Land Company, the corporation that the respondent is found guilty of blackmailing.

Hon. E. P. Dole, former Attorney General of the Territory, testified in part as follows:

"Do you know—have you had frequent occasion to be brought into contact with me in business, professionally and socially? A. I have a great deal. Q. What is my reputation in this community as to fair dealing and honesty, and my professional standing? A. I think it is very good. * * * * Q. And that is your conclusion; what is it based on, Mr. Dole? A. Well I have known Mr. Davis well for over eight years. I have come in contact with him in one way and another a great deal. His peculiarities have caused him to be widely and generally discussed among the bar and among the laity, which discussions I have heard a great deal, and while his peculiarities have been censured in these discussions, his erratic traits, and he has been accused of doing many things which a man of different temperament would not do, in all I have heard said about him I have never heard an opinion expressed that in his professional course that he was not an honest and upright lawyer. His traits are such that he attracts the attention of the whole communiy and a great deal of discussion concerning him has been had, and if he had a reputation for being a dishonest lawyer, I certainly would know it."

S. M. Ballou, Esq., and Hon. W. L. Stanley testified to the peculiarities of the respondent, also to his good standing in the community.

The respondent is deserving of some reproof and punishment from the court for the abuse of legal process but the judgment announced goes far beyond the demands of justice and is unreasonable and excessive.